UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHANE DURIGAN,

                    Plaintiff,

-vs-                                                    Case No. 6:04-cv-1147-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                    Defendant.
_____/

## MEMORANDUM OF DECISION

        Plaintiff Shane Durigan ["Durigan"] appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying his application for disability

insurance benefits and supplemental security income.  R. 12.  For the reasons set forth below, the

Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

        On January 17, 2002, Durigan filed a claim for disability insurance benefits and

supplemental security income benefits, claiming disability as of August 3, 2001.  R. 45.  On

March 12, 2004, the Honorable Chester G. Senf, Administrative Law Judge ["ALJ"], held a 16-

minute hearing on Durigan's claim in Orlando, Florida.  R. 255 - 269.  Non-attorney Robert L.

Hicks represented Durigan at the hearing.  R. 255.  Durigan testified, but no Vocational Expert

["VE"].

-1-

On April 30, 2004, the ALJ issued his decision that Durigan was not entitled to benefits. R. 18. Following a review of the medical and other record evidence, the ALJ found that Durigan could not perform his past relevant work as a warehouse worker and a flooring installer. R. 17, Finding 7. The ALJ found that Durigan retained the residual functional capacity to perform "substantially all of the full range of sedentary work." R. 18, Finding 11. The ALJ applied the Medical-Vocational Guidelines, and concluded that Durigan was not disabled. R. 18, Findings 12 - 14. On May 27, 2004, the Appeals Council denied review. R. 4.

On July 27, 2004, Durigan timely appealed the Appeals Council's decision to deny review to the United States District Court. Docket No. 1. On March 8, 2005, Durigan filed a memorandum of law in support of his appeal of the denial of review. Docket No. 15. On May 9, 2005, the Commissioner filed a memorandum in support of her decision that Durigan was not disabled. Docket No. 16. The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Durigan assigns three errors to the Commissioner. First, Durigan claims that the Commissioner failed to give proper weight to opinions from his treating physicians. Second, Durigan claims that the Commissioner erred by failing to solicit testimony from a VE. Third, Durigan claims that the Commissioner erred by failing to apply the proper standard in evaluating his subjective complaints of pain.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that the ALJ gave proper weight to the opinions of Durigan's treating physicians and that the ALJ's findings do not conflict with those opinions.

Docket No. 16 at 8.  Second, the Commissioner argues that Durigan's non-exertional limitations were not severe enough to warrant calling a VE.  Docket No. 16 at 16.  Third, the Commissioner argues that the ALJ properly evaluated Durigan's subjective complaints, but found that Durigan lacked credibility.  Docket No. 16 at 10.

### III.   **THE STANDARD OF REVIEW**

#### A.   **AFFIRMANCE**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to

determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405 (g)(Sentence Four).  The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.  *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).  A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under

sentence four, the district court must either find that the Commissioner's decision is not

supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant

to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to

develop a full and fair record of claimant's residual functional capacity); *accord Brenem v.*

*Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to

affirm, but also was insufficient for district court to find claimant disabled).

     Where the district court cannot discern the basis for the Commissioner's decision, a

sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his

decision.  *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate

to allow ALJ to explain his basis for determining that claimant's depression did not significantly

affect her ability to work) (treating psychologist acknowledged that claimant had improved in

response to treatment and could work in a supportive, non-competitive, tailor-made work

environment).  On remand under sentence four, the ALJ should review the case on a complete

record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir.

1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council);

*Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the

need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final

and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089,

1095.

     In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92;  *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must

be severe, making the claimant unable to do his or her previous work, or any other substantial

gainful activity which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§

404.1505 - 404.1511.

### A.      DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436,

438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The

Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the

social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42

U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record

exists if a claimant has waived the right to retained counsel, and even if the claimant is

represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's

obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d

931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).

This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of,

and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as

well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations

omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v.*

*Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required

where the record contains a diagnosis of a severe condition that the ALJ failed to consider

properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

      The claimant has the burden of proving the existence of a disability as defined by the

Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is

unable to establish an impairment that meets the Listings, the claimant must prove an inability to

perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This

assessment measures whether a claimant can perform past relevant work despite his or her

impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th

Cir. 1997).  The ALJ makes this determination by considering the claimant's ability to lift

weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545 (b).

      The ALJ first considers whether the claimant has the RFC to perform the functional

demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so,

the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the

functional demands of the job as it is generally performed in the national economy.  SSR  82-61.

In determining the physical exertional requirements of work available in the national economy,

jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

      The claimant must prove disability on or before the last day of his or  her insured status

for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981);

*Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).

If a claimant becomes disabled after losing insured status, the claim for disability benefits must

be denied despite the claimant's disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th

Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.    OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of

proof shifts to the Commissioner to establish that the claimant could perform other work that

exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In

determining whether the Commissioner has met this burden, the ALJ must develop a full record

regarding the vocational opportunities available to a claimant.  *Foote*, 67 F.3d at 1558; *Allen v.*

*Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through

exclusive reliance on the Medical-Vocational Guidelines [the "grids"].  *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from

an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart

P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983)

(exclusive reliance on the grids is appropriate in cases involving only exertional impairments,

impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a

full range of work at a given residual functional level or when a claimant has a non-exertional

impairment that significantly limits basic work skills."  *Walker v. Bowen*, 826 F.2d 996, 1002-03

(11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only

through the use of a vocational expert.  *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129,

-10-

132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.    TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); Lewis *v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2).

-11-

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to

-12-

the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner.  20 C.F.R. § 404.1527 (e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error.  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).  Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.  *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.    PAIN

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain

-13-

arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

## F.    CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

-14-

testimony or the implication must be so clear as to amount to a specific credibility finding."

*Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th

Cir.1983) (although no explicit finding as to credibility is required, the implication must be

obvious to the reviewing court).

### G.   MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d

143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not

required to order a consultative examination unless the record establishes that such an

examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*,

848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984)

(failure to order such an evaluation may be reversible error).  Under the regulations, however, the

ALJ may determine that a consultative examination or other medical tests are necessary.  20

C.F.R. § 416.917 (1998).

### V.   **APPLICATION AND ANALYSIS**

#### A.   **The Facts**

Durigan was involved in an automobile accident on March 24, 2000.  R. 108.  He

underwent physical therapy from March 27, 2000 through August 11, 2000 at Masters

Chiropractic.  R. 106, 88.  The initial assessment was cervical and lumbosacral sprain/strain,

lumbar disc displacement and cervicoradiculitis.  R. 107.  In August 2000 he reported

-15-

experiencing "good" improvement, estimating a 50 percent improvement over his condition on his first visit.  R 88.  He continued to have limited range of motion, spasms and point tenderness throughout his treatment.  R. 88.

Durigan sought treatment from Orlando Pain & Medical Rehabilitation Centers from April 9, 2001 through November 16, 2001.  At his initial examination on April 9, 2001, Durigan had taut trigger points of the posterior cervical bilaterally increased over the left.  Sensation to light touch was decreased diffusely on the left upper extremity.  There were positive orthopaedic findings of distraction and cervical spine compression.  There was also tenderness in of the lower paraspinal muscles of the lower back.  The assessment was cervical spine strain/sprain resulting in left upper extremity radiculitis, lumbar spine sprain/strain with iliolumbar and SI joint syndrome, myofascial pain affecting the cervical and interscapular muscles and mechanical low back pain.  R. 178.

Pedros Oliveros, M.D., P.T. of Orlando Pain & Medical Rehabilitation Centers (who is Board Certified in Physical Medicine and Rehabilitation, R. 113) examined Durigan on June 18, 2001.  Durigan stated he had constant neck pain, varying in intensity but worse with sudden movement of the neck and particularly with rotation to the right side and prolonged positioning.  He reported slight improvement with gentle stretching and Advil.  The neck pain radiated to the left upper extremity down to his hand.  He reported clumsiness ad weakness of the left hand that included dropping things.  Durigan described constant back pain with prolonged sitting and

standing and numbness and paresthesias[2] of the left lower extremity.  Examination revealed a

positive Spurling with radiation to the left upper extremity, positive Roo's, decreased light touch

sensation along the left L5/S1 dermatones, positive sitting straight leg raise, significant

tenderness over the left iliolumbar ligament and SI joint areas and the presence of trigger points.

Dr. Oliveros planned to have Durigan undergo MRIs of his cervical spine and lumbar spine, as

well as an EMG/nerve conduction study of his left-side extremities.  He advised Durigan to

remain active as tolerated, but to avoid lifting of any weight over 40 pounds until significant

resolution of his symptoms occurred.  Dr. Oliveros also planned to have Durigan undergo

rehabilitation, gradually increasing in intensity, resorting to trigger point injections if Durigan

failed to significantly improve.  R. 165 - 67.

Durigan returned to see Dr. Oliveros on August 22, 2001, complaining of radicular neck

pain radiating to both upper extremities, worse on the left side, and radicular low back pain.

Durigan reported that his physical therapy treatment had been cancelled due to missing a session.

He reported that he continued to experience constant neck pain, rating it at a four on a scale of

one to 10.  Dr. Oliveros noted that a July 27, 2001 cervical MRI showed straightened cervical

lordosis, positional or muscle spasm, and mild focal midline disc bulging C6/7 with midline

thecal sac and subarachnoid effacement.  A lumbar spine MRI performed the same day showed

L5/S1 narrowing posteriorly with signal loss, plus broad based central disc herniation with mild

thecal and subarachnoid effacement.

---

[2]An abnormal sensation such as burning, pricking and tingling.  STEDMAN'S MEDICAL DICTIONARY 1316 [27th ed., 2000] [hereinafter "STEDMAN'S"].

Dr. Oliveros noted that Durigan's physical examination and assessment remained essentially the same, but altered Durigan's assessment to add discogenic low back pain with facet arthropathy.  Durigan reported that he had tried stretching exercises to the cervical and intrascapular muscles to no avail, and Dr. Oliveros planned to schedule him for trigger point injections to these muscles followed by aggressive stretching.  Because of the ongoing symptoms, Dr. Oliveros recommended that Durigan remain on light duty.  R. 160 - 61.

On August 27, 2001, Durigan returned to Orlando Pain & Medical Rehabilitation Center for a trial of trigger point injections to address his chronic neck pain and headaches.[3]  No immediate complications were noted.  R. 156.

On October 31, 2001, Dr. Oliveros noted that Durigan had tolerated the DRS phase of treatment and the initial phase of active rehabilitation.  Durigan stated that he had experienced significant resolution of the radicular symptoms in the left lower extremity.  Dr. Oliveros opined that Durigan's paresthesia on the left lower extremity had resolved, indicating he had responded to the DRS treatment.  Durigan continued to experience localized deep-seated pain across the lumbosacral area, worse with prolonged positioning such as sitting and repetitive bending.  He also continued to experience constant neck pain of variable intensity.  He rated his back pain at three or four on a scale of one to 10, and his neck pain varied from two to seven on the same scale.  His assessment remained discogenic back pain, improving.  *Dr. Oliveros advised Durigan*

---

[3] In his brief, Durigan mistakenly describes physical examination results, R. 157, as having been recorded during his August 27, 2001 visit.  Docket No. 15 at 3.  That page is actually a duplicate of R. 166, and thus the examinations at issue occurred during Durigan's June 18, 2001 visit to Orlando Pain & Medical Rehabilitation Center.  Later in his brief, Durigan mistakenly references page 224 of the record.  Docket 15 at 6.  Pages 223 to 227 of the record relate to another claimant.  The Commissioner mistakenly certified those as Durigan's records by mistake.  Docket No. 16 at 1, n.1.

-18-

*to avoid prolonged sitting and repetitive bending, and to take frequent micro-breaks and change of position for comfort*.  R. 121 (emphasis supplied).  Durigan requested additional treatment for his neck pain, and Dr. Oliveros recommended a home exercise program and trigger point injections.  R. 121 - 22.

On November 16, 2001, Dr. Oliveros noted in a summary letter that Durigan had been seeing him since April due to constant back pain, weakness of his dominant left hand, pain in his thighs and numbness and paresthesias in the left lower extremity.  The initial assessment was left cervical radiculitis vs. carpal tunnel syndrome, thoracic outlet like syndrome secondary to hyperactive scalene and pectoralis muscle, posttraumatic myofascial pain affecting the cervical and interscapular muscles and left lumbar radiculitis.

After various treatments, Durigan returned for a final evaluation on November 16, 2001.  R. 108.  Durigan felt that the DRS protocol had been very helpful in regard to his radicular low back pain, estimating he felt 40 percent better overall.  R. 110.  However, Durigan continued to experience frequent low back pain with occasional paresthesias along the L5 - S1 dermatomes, worse on the left side.  In addition, he was still being bothered by recurrent neck pain.  He had difficulty with full cervical extension and rotation bilaterally to the left.  It was associated with suboccipital and bitemporal headaches.

Functionally, because of the recurrent neck and low back pain, Durigan was not able to enjoy his usual activities such as motorcycle riding and canoeing.  R. 110.  He continued to require Darvocet, taking it as needed for pain.  His final examination on November 16, 2001 revealed negative Spurling.  Sensation to light touch was intact through his extremities but

decreased along the left L5 - S1 dermatomes.  Muscle stretch reflexes were generally 2+.  There was now only very mild provocation of his low back pain with sitting straight leg raise that was slightly worse with dorsiflexion of the left foot.  There was positive tenderness of the left iliolumbar ligament and SI joint.  There were still positive trigger points with taut bands affecting the splenius capitis, cervical paraspinals, upper trapezius and elevator scapulae muscles bilaterally.  Negative Tinel's and Phalen's at both wrists, and strength of all his extremities was generally 5/5 except for the left ankle dorsiflexors and plantar flexors at 4+/5.  R. 111.

Dr. Oliveros' final assessment was persistent posttraumatic myofascial pain affecting the cervical and intrascapular muscles, left L5 and S1 radiculopathies by examination, discogenic low back pain, improved, and left pelvic dysfunction with iliolumbar ligament syndrome and S1 joint dysfunction.  R. 111.  Durigan was deemed to have achieved maximum medical improvement as of November 16, 2001.  The effects of his injuries made him susceptible to major injuries from various minor incidents.  Durigan reported that he was not able to sleep, sit or stand comfortably.  The effects of his injuries *"have left him with limited lifting capacity, limited ability in bending, kneeling, and sitting as well as limiting his repetitive motions with his arms."*  R. 112 (emphasis supplied).  Durigan indicated that he would have to reeducate himself to be able to do an occupation that was less physically challenging.  R. 111 - 12.

Arnoldo Isa, M.D., a neurologist, saw Durigan on December 6, 2001.  R. 190.  Dr. Isa noted that Durigan had been treated by a chiropractor and by Dr. Oliveros, but had not yet provided any medical records for him to evaluate.  Durigan complained of chronic neck pain, described as a burning sensation provoked by overuse of the arms (such as with his work doing

-20-

floor covering), with radiating pain down his left arm.  Durigan also complained of low back

pain at the center of the back that affected him most of the day and night, also provoked by work.

The pain radiated down both buttocks and hamstrings.  Durigan also stated he had headaches that

came from the neck and radiated up into the occipital area.  He described them as a tightening

aching sensation with no associated nausea.  The only medicine he had tried for them was Advil,

which was partially effective.

Dr. Isa's examination revealed moderate paracervical and trapezius tenderness.  R. 191.

On straight leg raising with the left leg, he complained of pain in his left paralumbar region.

Durigan walked steadily and pivoted without difficulty.  He had no muscle spasm or guarding in

the lower back.  He seemed to have full range of motion with forward flexion, lateral flexion, and

extension.  Dr. Isa prescribed Noritriptyline and Celebrex and opted to wait for the records from

Dr. Oliveros to consider additional treatment.  R. 190 - 92.

On January 11, 2002, Durigan returned to Dr. Isa for followup.  He indicated that his

headaches were about 30 percent better, though he continued to complain of some neck and back

pain.  Dr. Isa reviewed notes from Dr. Oliveros and conducted a physical examination, during

which Durigan changed positions from sitting to standing two or three times.  Dr. Isa noted that

Durigan seemed to have full range of motion across the lumbar and cervical areas.  His

impression was chronic cervical myofascial pain syndrome with cervicogenic headaches and

lumbar sprain/lumbar myofascial pain syndrome.  For the headaches, Dr. Isa continued the

Celebrex and Noritriptyline, which Durigan had indicated had also aided his lumbar

sprain/lumbar myofascial pain syndrome.  Regarding the lumbar problem, Dr. Isa informed

Durigan that he had likely already undergone all the reasonable potential treatments.  R. 189.

In his Impression / Plan of January 11, 2002, Dr. Isa noted that he had filled out a form

for "Work Force," which he described as "some type of vocational rehab assessment program."

R. 189.  Dr. Isa stated that "*I think at this time he can do light duty 2 hours a day, 5 days a week

and try to increase from there*."  R. 189 (emphasis supplied).  Dr. Isa explained to Durigan that

he *"is not completely and totally disabled from these injuries*."  R. 189 (emphasis supplied).

In a letter dated March 18, 2002, Dr. Isa indicated that Durigan was suffering from

lumbar discogenic pain and myofascial pain, cervicogenic headaches and cervical sprain.  He

noted that Durigan reported that his neck pain, back pain and headaches continued to interfere

with his sleep and quality of life and were exacerbated by activities such as lifting and bending,

which he required for his employment.  R. 187.

Sam Ranganathan, M.D., a Diplomate of the American Board of Internal Medicine,

performed a consultative examination on Durigan on May 14, 2002 for the Office of Disability

Determinations.  R. 195.  Durigan indicated he could sit or stand no longer than 15 minutes and

could walk for 15 to 20 minutes.  Examination revealed a decreased sensation to touch in the left

lower extremity.  Left paracervical tenderness was noted and there was positive straight leg raise

on the left at 30 degrees and the right at 50 degrees.  The diagnosis was cervical and lumbar spine

sprain and obesity.  Dr. Ranganathan opined that Durigan could stand or walk two hours a day,

and *could sit for six hours a day*.  R. 197 (emphasis supplied).  Dr. Ranganathan also opined that

Durigan could lift and carry 20 pounds occasionally, 10 pounds frequently.  Although Durigan

had no manipulative limitations, Dr. Ranganathan found that Durigan had "*[f]requent postural and environmental workplace limitation like heights and driving because of his cervical and lumbosacral spine condition*." R. 197 (emphasis supplied).

A Residual Functional Capacity Assessment was completed at the request of DDS on June 5, 2002 by Eugene A. Truchelut, M.D., a Diplomate of the American Board of Internal Medicine. R. 199 - 206. Dr. Truchelut opined that Durigan could lift and carry 20 pounds occasionally, and 10 pounds frequently, and could stand, sit and walk for six hours of an eight-hour day. Durigan had no limitations to his ability to push or pull, and could frequently climb, balance, kneel or crouch, but was limited to stooping and crawling only occasionally. R. 199 - 206.

Central Florida Family Health Center ["CFFHC"] notes from August 8, 2002 indicated that Durigan might have depression, and should follow up with Seminole County Mental Health Center. R. 232. He also had back and neck pain secondary to a herniated disk. He had decreased range of motion of the cervical and lumbar spine. R. 233.

On September 26, 2002, a Residual Functional Capacity Assessment was completed at the request of DDS by Violet A. Stone, M.D., University of Santo Tomas, who indicated that Durigan could only occasionally stoop and crouch. R. 207 - 14. Dr. Stone found that Durigan had no restrictions on his ability to climb, balance, kneel or crawl. Dr. Stone opined that Durigan could lift and carry 20 pounds occasionally, and 10 pounds frequently, and could stand, sit and walk for six hours of an eight-hour day. R. 208.

-23-

Durigan was seen at South Seminole Hospital on February 1, 2003, complaining of chronic neck, arm and back pain.  R. 215 - 22.  Durigan returned to CFFHC on February 6, 2003, complaining of continuing back pain and left hip pain.  R. 231.  Examination revealed decreased flexion and negative straight leg raise.  He also complained of depression, and was advised to followup with Seminole County Mental Health Center, which he had not done previously.  R. 231.  CFFHC notes revealed Durigan continued to complain of chronic low back pain on March 27, 2003.  R. 230.  Records from CFFHC revealed Durigan was seen for chronic back pain and agitation on June 16, 2003.  R. 228.

**B.     The Analysis**

**1.     Treating Physicians**

Durigan argues that the ALJ failed to give substantial weight to the opinions of two treating physicians, Dr. Oliveros and Dr. Isa.  First, he contends that the ALJ ignored Dr. Oliveros' October 31, 2001 statement [R. 121] that Durigan was to avoid prolonged sitting and repetitive bending, and needed to frequent micro-breaks and changes of position for comfort. Docket No. 15 at 8.  Second, Durigan argues that the ALJ erred in expressly affording little weight to Dr. Isa's opinion that Durigan was limited to light duty[4] two hours a day [R. 189] on the ground that Dr. Isa's opinion was partially based on Durigan's subjective complaints.  R. 15. Durigan contends that restrictions imposed by the two treating physicians conflict with the ALJ's

_____

[4]Claimants often argue on appeal that this Court should find significant a treating physician's opinion that the claimant is unable to do "light work" or some other level of work.  The Commissioner always asks this Court to reject that argument because treating physicians are not familiar with such terms of art, and with how those terms of art are used by the Commissioner.  Similarly, this Court rejects the Commissioner's argument that Durigan's treating physicians found that he could perform the more strenuous demands of 'light work," but does consider the doctors' statements in light of their ordinary meaning.  Docket No. 16 at 8.

determination that Durigan can sit for six hours in an eight-hour workday and perform substantially the full range of sedentary work.  R. 15.

Absent "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis, and medical evidence of a treating physician such as Dr. Oliveros, a Board Certified Physiatrist [R. 121], and Dr. Isa, a neurologist.  As treating physicians, the opinions of Drs. Oliveros and Isa are generally entitled to more weight than the opinion of a consulting physician, such as Dr. Ranganathan, a DDS Board Certified Internist [R. 195].  The ALJ must state with particularity the weight given different medical opinions and the reasons therefore.  Failure to do so may be reversible error.  Otherwise, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence.

First, the ALJ should have stated with particularity the weight that given to the opinions of Dr. Oliveros and Dr. Ranganathan.  Nevertheless, the failure to do so in this case is harmless error for the reasons stated below.[5]  Second, the ALJ did state one reason for giving little weight to Dr. Isa's opinion — that Dr. Isa based his opinion partially on his patient's subjective complaints [R. 15].  Although the Commissioner's brief notes the ALJ's stated reason [Docket No. 16 at 9], is it so obviously insufficient that the Commissioner bases no argument on it.  It would be strange indeed if a treating neurologist did not base his clinical opinion partially on his patient's subjective complaints.  The ALJ's failure to state with particularity an appropriate

---

[5]As is frequently the case in the Commissioner's brief on appeal, the Assistant Regional Counsel of the Social Security Administration and the Office of the United States Attorney supply reasons for affirmance that are not present in the ALJ's decision.  The district court often must determine whether such new arguments support affirmance, support a finding of harmless error, or support a finding of error in failing to articulate required reasons.

reason for discounting the opinion of Dr. Isa is nevertheless harmless error for the reasons stated below.

Dr. Oliveros did not opine that Durigan needed to *permanently* avoid prolonged sitting and repetitive bending, or that he would need to take micro-breaks and change positions frequently forever.  The statement at issue occurred in October 2001, during Durigan's treatment, and before he had achieved maximum medical improvement.[6]  R. 111.  Dr. Oliveros' November 16, 2001 opinion that Durigan had achieved maximum medical improvement, R. 108 - 13, does not include any such restrictions, stating only that the effects of Durigan's injuries "have left him with limited lifting capacity, limited ability in bending, kneeling and sitting as well as limiting his repetitive motions with his arms."  R. 112.  Durigan has not shown that the ALJ's assessment of his RFC contradicts the opinion of Dr. Oliveros, or that the ALJ failed to give substantial weight to that opinion.

Durigan has also failed to show that the ALJ erred by relying in part on the consultative opinion of Dr. Ranganathan.  Docket No. 15 at 9.  Durigan argues that Dr. Ranganathan's assessment on May 14, 2002 [R. 197] is contradicted by the earlier opinions of Dr. Oliveros on October 31, 2001 [R. 121] and November 16, 2001 [R. 112] and Dr. Isa on January 11, 2002 [R. 189].  As described above, Durigan's statement that Dr. Oliveros forbade him from sitting for six hours a day is not supported by the record.  Dr. Ranganathan's finding to the contrary does not contradict the opinion of Dr. Oliveros.

---

[6]Durigan alleged that he became disabled as of August 3, 2001.  R. 45.

Similarly, Dr. Isa did not, as Durigan contends, limit him forever to working no more than two hours a day, five days a week.  Rather, Dr. Isa filled out a form from a vocational rehabilitation group instructing Durigan to begin working at that level and to "try to increase from there."  R. 189.  Dr. Isa noted that Durigan seemed to have a full range of motion in the lumbar and cervical areas.  Dr. Isa did not find that Durigan was unable to work more than 10 hours a week for an extended period of time.

Further undercutting Durigan's argument is Dr. Isa's statement to Durigan and his wife — made in relation to opinion on the vocational rehabilitation group's form — that Durigan was "not completely and totally disabled from these injuries."  R. 189.  The only "opinion" of Dr. Isa that arguably aids Durigan's case is the already-discredited notion that Durigan could work no more than 10 hours per week.  Even if Dr. Isa truly held the opinion that Durigan was incapable of working more than 10 hours per week for an unlimited time — and it does not appear that he did — that opinion is not supported by the findings in Dr. Isa's own records.

## 2.    Vocational Expert

After concluding that Durigan lacked the RFC to perform his past relevant work, the ALJ was required to determine whether other jobs that Durigan could perform existed in significant numbers in the national economy.  R. 16. The ALJ found that Durigan had the exertional capacity to perform substantially all of the requirements of sedentary work.  R. 17.  Based on this finding — and Durigan's age, education, and work history — the ALJ applied the Medical Vocational Guidelines, or "grids", and concluded that they supported a finding of "not disabled".

R. 17.  The ALJ therefore determined that jobs existed in the national economy in significant numbers that Durigan could perform.  R. 16 - 17.

Durigan contends that his "severe non-exertional limitations, i.e., postural limitations and pain" precluded the ALJ from exclusive reliance on the grids and obligated him to consult a vocational expert.  Docket No. 15 at 10.  However, as discussed below, the ALJ found that Durigan's subjective complaints of pain were not totally credible.  R. 17, Finding 5.  As such, the ALJ was not obligated to fully credit those complaints of pain when determining whether to consult a vocational expert.  Durigan's arguments that the opinions of Dr. Oliveros and Dr. Isa prohibited him from engaging in prolonged sitting, repetitive bending, or even from working for more than two hours a day, Docket No.15 at 11, are unavailing for the reasons discussed in the previous section.

According to the ALJ, Durigan did suffer from some limitations  —  a prohibition on prolonged overhead reaching, kneeling, bending, or repetitive motion of the arms, as well as a need to occasionally change positions.  R. 17, Finding 6.  However, postural limitations or restrictions related to such activities as climbing ladders, ropes, scaffolds, balancing, kneeling, crouching, or crawling cannot erode the occupational base for a full range of unskilled *sedentary* work.  Those activities are not sedentary, or involved in sedentary work.  Social Security Ruling 96-9p.  In light of the objective medical records showing mild findings and a full range of motion, and Durigan's age of only 31, the ALJ's decision that Durigan's non-exertional limitations did not significantly compromise the range of sedentary work he could perform was supported by substantial evidence.  The ALJ did not err in failing to consult a VE.

### 3.    Pain Standard

Durigan's final complaint is that the ALJ failed to properly evaluate his complaints of pain.  He contends that he has satisfied the Eleventh Circuit pain standard by providing evidence of an underlying medical condition accompanied by objective medical evidence confirming the severity of the alleged pain and limitations.[7]  Docket No. 15 at 12.  That evidence, according to Durigan, consists of the following:

> Plaintiff has been diagnosed with posttraumatic myofascial pain affecting the cervical and interscapular muscles, left L5 and S1 radiculopathies by examination, discogenic low back pain and left pelvic dysfunction with iliolumbar ligament syndrome and SI joint disfunction.  R. 111 - 12.

Docket No. 15 at 12.

Durigan is partially correct.  Though no one disputes that his back and neck conditions constitute valid "underlying medical conditions" for purposes of the first part of the pain standard, none of the evidence he cites confirms the severity of the alleged pain.  Moreover, as the ALJ pointed out, Durigan's subjective pain testimony — that he experienced shooting, stabbing pains all the time, that he could only sit for 10 or 15 minutes and could only walk 75 feet, that he experienced constant neck pain and required assistance getting dressed, R. 13 - 14 — was not supported by the medical records.

Dr. Oliveros found that Durigan had limitations to his abilities to bend, kneel, sit and to perform repetitive arm motions, but nothing so extensive as what Durigan testified to.  Dr.

---

[7]The Commissioner's argument that she need not apply the Eleventh Circuit pain standard is wrong.  Docket No. 16 at 10.  The case cited by the Commissioner in support, *Wilson v. Barnhart*, 284 F.3d 1219, 1225 - 26 (11th Cir. 2002)(claimant must satisfy *Holt* pain standard, but need not refer to the language of the three-part test), does not stand for the proposition for which it is cited.

Ranganathan found that Durigan had normal motor strength, grip strength, and reflexes, and opined that he could stand or walk for up to 2 hours per day and sit for up to six hours.  Dr. Ranganathan also found that Durigan could lift up to 20 pounds occasionally and 10 pounds frequently, and had no manipulative limitations.  The limitations ascribed to Durigan by both these doctors were less stringent than those to which Durigan testified.

Moreover, as the ALJ noted [R. 15] that Durigan's MRI scans and EMG study resulted in normal findings.  Durigan complains that the ALJ failed to mention other medical findings that allegedly support his testimony "such as muscle spasm, cervical lordosis, numbness, tenderness, positive straight leg raise, positive Spurling signs, positive Roo's signs, positive Phalen's, positive Tinel's and limited range of motion."  Docket No. 15 at 13.  However, Durigan offers no explanation as to how the diagnostic indicators that he cites support the severe pain to which he testified.  It does not do so.  Durigan's subjective pain testimony fell short of satisfying the Eleventh Circuit pain standard, and the ALJ articulated sufficient reasons for failing to credit it.

Durigan also complains that the ALJ failed to consider the side effects of his medications in assessing his credibility.  Docket No. 15 at 13.  Durigan testified that those medications make him irritable and drowsy.  R. 266.  However, it is not clear from Durigan's testimony that they made him so irritable or so drowsy as to significantly impair his ability to work.  There is no other evidence in the record that such is the case.  The ALJ did not err in failing to consider the side effects of those medications.

## VI.   CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED.**  The

-30-

Clerk shall enter a judgment and close the case.

      **DONE AND ORDERED** this 19th day of August, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia     30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL     33602

The Honorable Chester Senf
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL     32817